1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT**

9

**CENTRAL DISTRICT OF CALIFORNIA**

10

11  MICHAEL HUNT,                          Case No. CV 17-8064 JFW (PVC)

12                    Plaintiff,

**REPORT AND RECOMMENDATION**
13          v.                            **OF UNITED STATES MAGISTRATE**
                                          **JUDGE**
14  CITY OF LOS ANGELES, et al.,

15                    Defendants.

16

17        This Report and Recommendation is submitted to the Honorable John F. Walter,

18  United States District Judge, pursuant to 28 U.S.C. § 636 and General Order 05-07 of the

19  United States District Court for the Central District of California.

20

21                                        **I.**

22                               **INTRODUCTION**

23

24        On November 3, 2017, Plaintiff, a private citizen proceeding *pro se*, filed a civil

25  rights action alleging that the City of Los Angeles (the "City"), former Los Angeles Police

26  Department ("LAPD") Chief Charles Beck, and Matthew M. Johnson, former President of

27  the Los Angeles Board of Police Commissioners, violated his constitutional rights

28  pursuant to 42 U.S.C. § 1983 and various state laws.  ("Complaint," Dkt. No. 1).

1    The operative Second Amended Complaint was filed on April 3, 2019.  ("SAC,"

2    Dkt. No. 45).  As amended by the District Judge's dismissal of several causes of action on

3    December 12, 2019, (Dkt. No. 65), the SAC raises claims against Beck, Johnson and the

4    City arising from three events:  (1) Plaintiff's arrest in the lobby of the LAPD

5    headquarters on November 10, 2015 following a Los Angeles Police Board of

6    Commissioners meeting (the "Police Commission Incident," SAC ¶¶ 12-15);

7    (2) Plaintiff's arrest on January 15, 2016 at City Hall (the "City Hall Incident," *id.* ¶¶ 16-

8    17); and (3) the City's filing of an unsuccessful petition for a restraining order against

9    Plaintiff on June 21, 2016 (the "TRO Incident," *id.* ¶ 21).  The surviving claims are:

10

11          Police Commission Incident:  First Amendment claim as to all Defendants

12          (Claim One); Fourth Amendment claim as to all Defendants (Claim Two);

13          Bane Act claim as to the City (Claim Five); False Imprisonment claim as to

14          the City (Claim Six)

15

16          City Hall Incident:  False Imprisonment claim as to the City (Claim Six)

17

18          TRO Incident:  First Amendment claim as to the City (Claim Three); Bane

19          Act claim as to the City (Claim Five)

20

21    (Dkt. No. 65 at 3).[1]

22    _____

23    [1] Beck and Johnson are sued in both their individual and official capacities.  (SAC ¶ 4).
      To the extent that Plaintiff is seeking monetary damages, the official capacity claims
      against Beck and Johnson and the claims brought directly against the City are redundant.

24    *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985).  To the extent that Plaintiff is seeking
      injunctive relief, Beck and Graham are improper Defendants because, as the *former*

25    LAPD Chief and the *former* President of the Los Angeles Board of Police Commissioners,
      respectively, they no longer have an "official capacity" and would be unable to provide

26    whatever injunctive relief Plaintiff might be seeking.  *See Los Angeles Cnty. Bar Ass'n v.
      March Fong Eu*, 979 F.2d 697, 704 (9th Cir. 1992) (defendant sued in official capacity for

27    prospective injunctive relief "must have some direct connection with the enforcement of
      the [allegedly unconstitutional] act") (brackets in original; internal quotation marks

28    omitted).  As such, for ease of reference, the Court will address the claims against Beck
      and Johnson in their individual capacities only.

1    Pursuant to the Court's Scheduling Order, the discovery cut-off was May 1, 2020,

2    and the deadline for filing dispositive motions was July 2, 2020.  (Dkt. No. 67 at 3).  On

3    June 30, 2020, Plaintiff obtained counsel for the first time in this action.  (Dkt. No. 76).

4

5    The next day, July 1, 2020, Defendants jointly filed the instant Motion for

6    Summary Judgment, supported by a Memorandum of Points and Authorities, ("MSJ,"

7    Dkt. No. 77); a Separate Statement of Undisputed Material Facts, ("SUF," Dkt. No. 77-1);

8    the declarations of LAPD Sergeant Travis Jones, ("Jones Decl.," Dkt. No. 77-2), LAPD

9    Sergeant Edward R. Petterez, ("Petterez Decl.," Dkt. No. 77-3), LAPD Captain Richard

10   Stabile, ("Stabile Decl.," Dkt. No. 77-5),[2] and City of Los Angeles Deputy City Attorney

11   Hugo S. Rossitter ("Rossitter Decl.," Dkt. No. 77-4); and a Request for Judicial Notice.

12   ("RJN," Dkt. No. 78).  On July 13, 2020, the parties filed a Joint Stipulation to continue

13   the hearing date on the MSJ from August 18, 2020 to October 6, 2020, to afford Plaintiff's

14   counsel time to familiarize herself with the case and to prepare an opposition.  (Dkt. No.

15   79).  The Court granted the request on July 15, 2020.  (Dkt. No. 80).

16

17   Plaintiff filed an Opposition to the MSJ, including a request for a continuance, on

18   September 15, 2020, supported by a Memorandum of Points and Authorities, ("MSJ

19   Opp.," Dkt. No. 81); a Response to Defendants' Separate Statement of Undisputed Facts,

20   including Plaintiff's "Additional Uncontroverted Facts," ("SUF Resp.," Dkt. No. 81-1);

21   the declarations of Plaintiff Michael Hunt, ("Hunt Decl.," Dkt. No. 81-2), and counsel

22   Yana G. Henriks, ("Henriks Decl.," Dkt. No 81-3); Plaintiff's Objections to Evidence, ("P

23   Evid. Obj.," Dkt. No. 81-4); and Plaintiff's Objections to Defendants' Request for Judicial

24   Notice.  ("Obj. RJN," Dkt. No. 82).  Plaintiff also filed a Request to Cross-Examine

25   Declarants, seeking permission to cross-examine Jones, Petterez, Stabile and Rossitter at

26

27   _____

[2] The Jones and Stabile declarations attach as an exhibit the same DVD containing a videotape of the events of November 10, 2015 in the Police Commission Incident (the "Video").  (Jones Decl. ¶ 6 & Exh. A; Stabile Dec. ¶ 7 & Exh. A).  Jones also incorporates by reference a link to the City's official video of the November 10, 2015 Police

28   Commission meeting.  (*Id.* ¶ 5, as corrected by Reply at 5 n.3).

1    the MSJ hearing, or, in the alternative, to take their depositions following the hearing.

2    ("Cross-Exam. Req.," Dkt. No. 83).

3

4        On September 22, 2020, Defendants filed a Reply in support of the MSJ, which, in

5    addition to addressing Plaintiff's arguments in the Opposition, also included objections to

6    Plaintiff's request for a continuance, a reply to Plaintiff's Response to the SUF, a response

7    to Plaintiff's Objections to Evidence, Defendants' objections to Plaintiff's evidence and

8    Plaintiff's "Additional Undisputed Facts," and a response to Plaintiff's objections to the

9    RJN.  ("Reply," Dkt. No. 84).  The following day, September 23, 2020, Defendants filed

10   an opposition to Plaintiff's Request to Cross-Examine Declarants.  ("Opp. Cross-Exam.

11   Req.," Dkt. No. 85).

12

13       Also on September 23, 2020, Plaintiff filed a Motion to Strike Portions of

14   Defendants' Oversized Reply and to Deem Plaintiff's Additional Facts Undisputed,

15   ("MTS," Dkt. No. 86), supported by a second declaration of counsel Yana G. Henriks.

16   ("Henriks Decl. II," Dkt. No. 86-1).  Defendants filed an Opposition to the Motion to

17   Strike on September 25, 2020.[3]  ("Opp. MTS," Dkt. No. 88).

18   _____

19   [3] In the Motion to Strike, Plaintiff argues that pages 13 through 25 of the Reply should be
     stricken because "[i]t is common practice that Reply Briefs total only ten (10) to twelve
20   (12) pages," and because the District Judge's Standing Order in another case limits Reply
     briefs to twelve pages absent prior authorization. (MTS at 4).  The motion to strike is
21   frivolous for at least two reasons.  First, there is no Standing Order in this case governing
     the permissible length of reply briefs.  Second, nearly all of the pages of the "oversized"
22   Reply brief that Plaintiff maintains should be stricken are responses to documents that
     Plaintiff filed separately from his Opposition to the MSJ and could have been filed
23   separately from the Reply.  In the Reply, Defendants explain their decision to incorporate
     their objections and responses into the Reply in a footnote, stating:  "In the interest of
24   economy due to remote resource restrictions created by the ongoing pandemic,
     Defendants' responses to Plaintiff's Opposition and Objections (Dkt. #81, #81-1, #81-2,
25   #81-4, and #82), are consolidated herein in one Brief." (Reply at 15 n.6).  Plaintiff's
     contention that it was somehow "procedurally improper" for Defendants not to file their
26   clearly-labeled objections and responses in separate documents -- without any showing
     whatsoever of any possible prejudice or confusion -- elevates form over substance to an
     indefensible degree.  (MTS at 6 n.1).

27

28   Plaintiff also argues that the "Additional Uncontroverted Facts" he appended to his
     responses to Defendants' Statement of Uncontroverted Facts should be deemed admitted
     because Defendants did not address them individually in a separate document, but instead

1       The Court held a hearing on the Motion for Summary Judgment and related

2  motions on December 3, 2020.  (Trans., Dkt. No. 91).  Pursuant to a request by Plaintiff's

3  counsel during oral argument, on December 7, 2020, the Court issued an order authorizing

4  Plaintiff to file a motion to reopen discovery within fourteen days.  (Dkt. No. 93).

5  However, two days later, on December 9, 2020, Plaintiff's counsel filed an *ex parte*

6  application to be relieved as counsel of record for Plaintiff, ("Appl."), supported by the

7  declaration of counsel Yana G. Henriks ("Henriks Decl.").  (Dkt. No. 94).  The following

8  day, Ms. Henriks filed a supplemental declaration in support of the application.  ("Henriks

9  Supp. Decl.," Dkt. No. 95).  On December 15, 2020, the Court held an *in camera* hearing

10  at which Plaintiff and Plaintiff's counsel appeared.[4]  The Court concluded that good cause

11  existed to grant the application, and on December 18, 2020, issued an order relieving Ms.

12  Henriks and her firm as counsel for Plaintiff.  (Dkt. No. 98).  The Court granted Plaintiff

13  thirty days to find new counsel, and held that if Plaintiff did not secure counsel by the

14  Court's deadline, he would be deemed to be proceeding *in pro se*.  (*Id*. at 2).  The Court

15

16  "cluster[ed] the facts together and address[ed] them in a lump sum fashion" in the Reply.
(*Id*. at 7).  This, too, is frivolous.  There is no provision in Local Rule 56 for the opposing

17  party to submit additional "undisputed facts."  Local Rule 56-1 requires a moving party to
lodge a proposed "Statement of Uncontroverted Facts" setting forth "the material facts as

18  to which the moving party contends there is no genuine dispute."  C.D. Cal. L.R. 56-1.
Local Rule 56-2 requires the opposing party to file "a separate document containing a

19  concise 'Statement of Genuine Disputes' setting forth all material facts as to which it is
contended there exists a *genuine dispute* necessary to be litigated."  C.D. Cal. L.R. 56-2

20  (emphasis added).  Local Rule 56-3 states that the Court may assume that the facts in the
*moving party's* Statement of Uncontroverted Facts are "admitted without controversy"

21  unless the facts are included in the opposing party's Statement of Genuine Disputes *and*
controverted by evidence filed in opposition to the motion.  C.D. Cal. L.R. 56-3.  The

22  Local Rule does not invite the opposing party to add to the list of *undisputed* facts, much
less require a moving party to respond to them.  If Plaintiff wished to assert "Additional

23  Undisputed Facts" and require Defendants to separately and individually address them, it
was incumbent on him to file a counter-motion for summary judgment, which he did not

24  do.

25  Accordingly, Plaintiff's Motion to Strike is DENIED in its entirety.  The Court will
consider the Reply in full in this Report and Recommendation and will disregard

26  Plaintiff's statement of "Additional Uncontroverted Facts."

27  [4] Although Defendants did not participate in the *in camera* hearing, on December 14,
2020, the day before the hearing, they filed a response to Plaintiff's counsel's *ex parte*

28  application in which they stated that they did not oppose the application if good cause was
shown, but did oppose any further delay by way of an extension of time for Plaintiff to
seek new counsel.  (Dkt. No. 97 at 1).

1  further extended the deadline for Plaintiff to file a motion to reopen discovery, either

2  through new counsel or *in pro se*, to the same date, *i.e.*, January 17, 2021.[5]  (*Id.*).  Because

3  no notice of appearance or motion to reopen discovery was filed by that deadline, on

4  January 25, 2021 the Court issued an order deeming Plaintiff to have reverted to his *pro se*

5  status and closing the window on any further motions to amend the Scheduling Order.[6]

6  (Dkt. No. 102).

7

8      For the reasons stated below, it is recommended that the Court:  (1) GRANT

9  Defendants' Motion for Summary Judgment on Plaintiff's Fourth and First Amendment

10  claims under 42 U.S.C. § 1983 and enter judgment in favor of Defendants DISMISSING

11  those federal constitutional claims WITH PREJUDICE; and (2) decline to exercise

12  supplemental jurisdiction over Plaintiff's Bane Act and false imprisonment claims and

13  DISMISS those state law claims WITHOUT PREJUDICE.

14

15                                    **II.**

16                          **SUMMARY OF FACTS**

17

18      Except as specifically noted, the following facts are either undisputed or

19  established by incontrovertible written records or video recordings:

20

21

22

23

24

_____

25  [5] Because January 17, 2021 was a Sunday and January 18, 2021 was a holiday, Plaintiff
    effectively had until January 19, 2021 to file a motion to reopen discovery.  *See* Fed. R.
26  Civ. P. 6(a)(1).

27  [6] For the sake of clarity, where appropriate, the Court will occasionally refer to motions or
    arguments offered on Plaintiff's behalf in these summary judgment proceedings as having
28  been submitted or raised by "counsel."  It is understood that all statements made by
    counsel for Plaintiff's benefit are deemed to have been made by Plaintiff himself.

A.     **Background Facts**

Plaintiff is an African-American "community activist" who is dedicated to confronting "City officials for discriminatory conduct and policies against African Americans." (Hunt Decl. ¶¶ 3, 9). Plaintiff states that he has attended over 200 meetings at City Hall and the Los Angeles Police Commission wearing political "garb" consisting of "a Ku Klux Klan hood adorned with a Nazi Swastika . . . as a form of protest[.]"[7] (*Id.* ¶¶ 3, 8). He states that he is considered a "gadfly by the City of Los Angeles" for his First Amendment activities, which have included two successful prior lawsuits against the City for violations of his First Amendment rights. (SAC ¶¶ 8, 10).

B.     **The Police Commission Incident**

Plaintiff attended a meeting of the Los Angeles Police Board of Commissioners on November 10, 2015. (Hunt Decl. ¶ 12). Plaintiff states that he submitted five or six public comment cards so that he would be given a chance to speak, (*id.* ¶ 13), and brought his protest garb, which he intended to put on when he was called to speak. (*Id.* ¶ 14).

The meeting was disrupted by individuals from the Black Lives Matter Movement, and Johnson recessed the meeting. (SUF 1; *see also* http://lacity.granicus.com/ MediaPlayer.php?view_id=97&clip_id=15288, at 37:50 to 39:00). All visitors, including Plaintiff, were cleared from the meeting room. (*Id.*)[8]

---

[7] Plaintiff alleges in the SAC that he has "attended over 100 [official city] meetings." (SAC ¶ 8). In his declaration submitted in opposition to the MSJ, Plaintiff states that he has "attended approximately over 200 City of Los Angeles meetings at City Hall and the Los Angeles Police Commission wearing [his] protest garb." (Hunt Decl. ¶ 8). Accordingly, it appears that Plaintiff has continued to attend and participate in City meetings since filing this action.

[8] Plaintiff purports to dispute many of the facts in Defendants' Statement of Undisputed Facts on grounds that are simply non-responsive or not material. By way of example only, Plaintiff "disputes" SUF 1 on the grounds that (1) Stabile's declaration "suggests" that the disturbance was large, and (2) "[o]nly the two members of the public that had

1    In the lobby, for several minutes, some activists who had attended the meeting

2    loudly chanted, "You think it's a game!"; "Black lives they matter here!"; and "If we

3    don't get no justice, then you don't get no peace."  (SUF 2; *see also* Video at 00:47 *et*

4    *passim*).  (SUF Resp. 3 at 6).  After the chanting stopped, Stabile, speaking through a

5    megaphone, declared an unlawful assembly and issued a dispersal order.  (SUF 3; *see also*

6    Stabile Decl. ¶¶ 8-9).  The dispersal order required the public to leave the building and

7    warned those in the lobby that they had two minutes to disperse before they would be

8    subject to arrest for violation of California Penal Code 409, regardless of their purpose for

9    remaining.[9]  (Stabile Decl. ¶ 9; *see also* Video at 7:00 *et passim*).  Plaintiff concedes that

10   it was "quite noisy" in the building at that time, and claims that he was unable to hear

11   everything that Stabile said.  (Hunt Decl. ¶ 26).

12

13   Plaintiff did not disperse.  (SUF 4).  Instead, he held up some papers and repeatedly

14   stated to police and to the press that he previously had received "a 409," for which the

15   City had had to pay him $215,000.  (*Id.*; *see also* Video at 8:30-10:58; Stabile Decl. ¶ 10).

16   Stabile issued a follow up warning, cautioning, "Ladies and gentlemen, I need you to

17   _____

18   been voicing their concerns [during the meeting] should have been asked to leave."  (SUF Resp. 1 at 2).  In fact, Stabile says nothing about the number of individuals who disturbed the meeting, but merely asserts that the meeting was recessed "when community members

19   created a disturbance during the meeting that prevented the Commission from peacefully and orderly conducting business."  (Stabile Decl. ¶ 5).  Similarly, Plaintiff's contention

20   that Johnson's decision to recess the meeting was a violation of meeting rules is not material to this dispute.  (*See, e.g.*, SUF Resp. 1 at 3; SUF Resp. 8 at 11-12).  Neither the

21   SAC nor any of the prior iterations of Plaintiff's claims raises claims based on violations of the Brown Act.  This action puts at issue what occurred *outside* the Police Commission

22   meeting, not what happened during it.  Whether or not the Police Commission meeting was properly adjourned is not material to the determination of whether Plaintiff was

23   unconstitutionally arrested after the adjournment.

24   Plaintiff's "objections" are non-responsive to the undisputed facts that (1) there was a meeting of the Police Commission on November 10, 2015; (2) the meeting was disrupted;

25   (3) Johnson called a recess to the meeting; and (4) all visitors were cleared from the room. Accordingly, Plaintiff does not identify a disputed issue of material fact as to SUF 1.

26

27   [9] Section 409 provides:  "Every person remaining present at the place of any riot, rout, or unlawful assembly, after the same has been lawfully warned to disperse, except public

28   officers and persons assisting them in attempting to disperse the same, is guilty of a misdemeanor."  Cal. Penal Code § 409.

leave the lobby or you will be subject to arrest."  (Stabile Decl. ¶ 11; Video at 9:38).

Plaintiff and one other activist, Wayne Spindler, faced Stabile and did not disperse.

(Video at 7:00-10:58; Stabile Decl. ¶ 12).  Approximately two minutes and thirty seconds

after Stabile issued the initial dispersal order, Plaintiff and Spindler were put under arrest

on Stabile's orders for violation of Penal Code § 409.  (Video at 10:58; Stabile Decl.

¶ 13).  The video does not show that the arresting officers used any force in effecting the

arrests, and Plaintiff did not put up any resistance.  (Video at 10:58 *et passim*).

Even though Plaintiff claimed that he submitted five or six public comment cards

so that he could speak at the Police Commission meeting, (Hunt Decl. ¶ 13), and did not

display signs of illness in the lobby, (Video at 7:00 - 10:58), upon his arrest, Plaintiff

informed his arresting officers that he was feeling ill.  (Video at 18:44-18:51; Stabile

Decl. ¶ 14).  He was allowed to sit down and wait for the rescue ambulance that was

summoned to take him to Los Angeles County/USC Medical Center for evaluation.

(Video at 18:51 et passim; Stabile Decl. ¶14).

Stabile states that he did not order Plaintiff's arrest to retaliate against him for his

political activism or to prevent him from speaking at the Police Commission meeting that

day.  (Stabile Decl. ¶¶ 15-16).  With the exception of "two short intervals" when Captain

Stabile took over the camera, LAPD Detective Travis Jones videotaped the events

comprising the Police Commission Incident, including the lobby protest, the dispersal

order, and the arrests of Plaintiff and Spindler on charges of failing to disperse.  (Jones

Decl. ¶¶ 6, 14 & Exh. A; Stabile Decl. ¶ 7 & Exh. A).

## C.    The City Hall Incident

On January 15, 2016, approximately two months after the Police Commission

Incident, Plaintiff went to City Hall to attend a City Council meeting, with the intention of

1   submitting a public comment card to address the City Council.  (Hunt Decl. ¶ 42).

2   Plaintiff successfully passed through the metal detectors and put on his KKK hood,

3   covering his face, while still in the security screening area.  (SUF 16).

4

5       Sergeant Petterez states that he noticed an individual (Plaintiff) wearing a KKK

6   hood and asked him to remove his hooded mask while walking the hallways in City Hall

7   because facial coverings pose a security concern.  (Petterez Decl. ¶ 5).  According to

8   Petterez, the individual refused to remove his mask and became "verbally abusive,"

9   yelling that it was his First Amendment right to wear the KKK hood over his head

10   anywhere in City Hall.  (*Id*.).  Petterez states that he explained that anonymity was

11   permitted inside public meetings, but not in hallways.  (*Id*. ¶ 6).  According to Petterez,

12   the individual became angry and belligerent, and waved his arms while yelling

13   explicatives.  (*Id.*).  Petterez ordered officers to place him in handcuffs for their safety and

14   the safety of the public.  (*Id.*).  When the hood was removed, the individual was identified

15   as Plaintiff.  (*Id.*).

16

17       Plaintiff states that he was never asked to remove his hood, but was instead

18   immediately handcuffed without warning after he put on his hood, and was not permitted

19   to proceed to the City Council meeting.  (Hunt Decl. ¶¶ 46-47).  Plaintiff further denies

20   that he was verbally abusive or belligerent.  (*Id.* ¶ 48).  Instead, Plaintiff attests that he

21   said something like "Fuck off, go get your lieutenant."  (*Id.* ¶ 49).  Plaintiff claims that he

22   also told "them" that he had "been through the hallways wearing [his] protest garb over

23   200 . . . times, and that [his] garb was protected as free speech."  (*Id.*).

24

25       While Plaintiff was detained, officers ran an identification and warrant check.

26   (SUF 19).  Officers discovered that Plaintiff had three outstanding warrants for:

27   (1) resisting arrest and battery on a police officer; (2) unlawful vending; and

28   (3) suspended license/failure to appear.  (SUF 19; Petterez Decl. ¶ 6-7 & Exh. A).

1  Petterez states that he had no reason to doubt the validity of the warrants.  (*Id.* ¶ 9).

2  Plaintiff was arrested pursuant to the outstanding warrants and was not booked for any

3  additional open charges.  (SUF 20).

4

5  Petterez states that Plaintiff's arrest was not for the purpose of retaliating against

6  him for his activism or to prevent him from exercising his First Amendment rights.

7  (Petterez Decl. ¶ 10; SUF 22).

8

9  **D.    The TRO Incident**

10

11  On June 21, 2016, Deputy City Attorney Hugo Rossitter filed a petition for a

12  Workplace Violence Temporary Restraining Order on behalf of Councilmember Mitch

13  O'Farrell.  (SUF 23).  The petition sought an order that would have required Plaintiff to

14  stay at least ten yards from O'Farrell during City Council meetings and within City

15  facilities, two yards from O'Farrell's City Hall office, and one hundred yards from

16  O'Farrell's home.  (RJN, Exh. 4 at 35) (continuous pagination).  However, the petition

17  also specified that Plaintiff "[m]ay attend any City public meetings and may engage in

18  public comment in accord with Council rules and procedures."  (*Id.*; SUF 28).  The

19  petition included a declaration by O'Farrell in which he described an incident between

20  him and Plaintiff on June 15, 2016.  Accordingly to O'Farrell, Plaintiff allegedly followed

21  him down the hall outside the City Council chamber while yelling and cursing at him, as

22  O'Farrell accompanied a group of elementary school children for a photo op and question

23  and answer session.  (RJN, Exh. 4 at 38-39).  O'Farrell alleged that Plaintiff stood

24  approximately twelve to fifteen inches away from him as he continued cursing.  (*Id.* at

25  39).

26

27  A hearing was held on the petition in the Los Angeles County Superior Court on

28  July 8, 2016.  (*Id.*, Exh. 5 at 47).  Plaintiff represented himself at the hearing *in propria*

*persona*. O'Farrell also attended, represented by Rossitter. (*Id.* at 47-49). At the hearing, O'Farrell testified that Plaintiff had followed him into the hallway at City Hall and "was invading [his] personal space," although O'Farrell also admitted that Plaintiff did not strike him. (*Id.* at 49). O'Farrell further testified that Plaintiff dropped "countless 'F' bombs" when he was following close to him, and that he was afraid that things could escalate. (*Id.* at 51). O'Farrell also explained that the incident occurred outside of the City Council chamber, in the City Hall Rotunda. (*Id.* at 52). The Court noted that "in the Rotunda we're still talking about public property. We're still talking about an area where there are great freedoms of speech." (*Id.*).

In response to a question from the Court, Plaintiff did not deny that the hallway incident occurred, but stated that he had no intent to harm O'Farrell, and that he made no attempt to threaten him. (*Id.* at 53). Plaintiff further reminded the Court that he was a "Ninth Circuit winner and [he] won City Hall before," and maintained that the encounter was "just freedom of speech." (*Id.*).

The Court concluded that the City had not met its burden for a restraining order, but then spoke directly to Plaintiff:

| The Court: | I'm going to suggest this to you, Mr. Hunt. |
| [Plaintiff]: | Yes, ma'am. |
| The Court: | Without interfering with all of your rights of speech -- |
| [Plaintiff]: | Uh-huh. |
| The Court: | -- that does not include getting so close to the Councilman that it causes him alarm. |
| [Plaintiff]: | Okay. |
| The Court: | In other words, you wouldn't like it, I wouldn't like it, nobody likes somebody in their face. |

| | | |
|---|---|---|
| 1 | [Plaintiff]: | Yes, ma'am. |
| 2 | The Court: | And you don't even like your children in your face, but -- at |
| 3 | | least I don't, and so what I am going to say is that you can |
| 4 | | continue to go to the council meetings, you can continue to |
| 5 | | protest, but you're going to be right back here again if you get |
| 6 | | very close to the Councilman or if you follow him outside of |
| 7 | | City Hall. |
| 8 | [Plaintiff]: | I followed the children. |
| 9 | The Court: | You assure me that won't happen? |
| 10 | [Plaintiff]: | I assure you. |

(*Id.* at 53-54).

# III.

# STANDARD OF REVIEW

Rule 56(a) of the Federal Rules of Civil Procedure authorizes the granting of summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The standard for granting a motion for summary judgment is essentially the same as for granting a directed verdict.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  Judgment must be entered "if, under the governing law, there can be but one reasonable conclusion as to the verdict."  *Id.* at 250.

The moving party has the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each cause of action upon which the moving party seeks judgment.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "Material facts are those which may affect the

outcome of the case." *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006). "A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party." *Id.* Where, as here, the moving party does not bear the burden of proof at trial, the moving party may discharge its burden by showing "there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325; *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).

If the moving party sustains its burden, the burden then shifts to the nonmovant to cite to "particular parts of materials in the record" demonstrating a material fact is "genuinely disputed." Fed. R. Civ. P. 56(c)(1); *Celotex Corp.*, 477 U.S. at 324; *Anderson*, 477 U.S. at 256; *Devereaux*, 263 F.3d at 1076 ("Once the moving party carries its initial burden, the adverse party 'may not rest upon the mere allegations or denials of the adverse party's pleading,' but must provide affidavits or other sources of evidence that 'set forth specific facts showing that there is a genuine issue for trial.'") (citations omitted). Summary judgment must be granted for the moving party if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322; *see also Anderson*, 477 U.S. at 252 (parties bear the same substantive burden of proof as would apply at a trial on the merits).

"[I]n ruling on a motion for summary judgment, the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999) (quoting *Anderson*, 477 U.S. at 255); *Groh v. Ramirez*, 540 U.S. 551, 562 (2004). However, summary judgment cannot be avoided by relying solely on "conclusory allegations [in] an affidavit." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (more than a "metaphysical doubt" is required to

14

establish a genuine dispute of material fact). "The mere existence of a scintilla of evidence in support of the plaintiff's position" is insufficient to survive summary judgment; "there must be evidence on which the [fact finder] could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

## IV.

## DISCUSSION

### A.    Plaintiff's Request for a Continuance, or, in the Alternative, for Authorization To Cross-Examine or Depose Declarants, Is Denied

In his Opposition to the MSJ, Plaintiff requests a continuance of three to four months pursuant to Rule 56(d) "due to the need to conduct discovery." (Opp. MSJ at 24). Plaintiff notes that "counsel is newly retained" and states that Plaintiff was proceeding *pro se* "at the time defendants filed their Motion for Summary Judgment."[10] (*Id.*). Plaintiff states that he "anticipates filing a motion to re-open discovery"[11] for the purpose of (1) deposing Defendants Beck, Johnson, and the City's Rule 30(b)(6) witness(es), declarants Jones, Petterez, Stabile, and Rossitter, and witnesses LAPD Commander John Peterson and Councilman Mitch O'Farrell; and (2) propounding written discovery related

---

[10] Technically, Plaintiff was represented "at the time" Defendants filed their summary judgment motion. Plaintiff's counsel filed a notice of appearance on June 30, 2020. (Dkt. No. 76). Defendants' MSJ followed the next day, on July 1, 2020. (Dkt. No. 77). However, it is accurate that Plaintiff was proceeding *pro se* prior to the May 1, 2020 discovery cut-off and for two months thereafter. (*See* Dkt. No. 67 at 1).

[11] It was unclear whether Plaintiff was actually moving in the Opposition to re-open discovery or was merely putting the Court on notice that he "anticipated" filing a motion to re-open discovery at some point in the future. However, in the Opposition, Plaintiff quotes Rule 56(d) and cites case law applying Rule 56(d) in the portion of the Opposition requesting a continuance. (Opp. MSJ at 24). Accordingly, the Court construes the "request for continuance" as a motion under Rule 56(d). Plaintiff clarified at the MSJ hearing that he wished to move separately to reopen discovery, but, as stated above, although the Court expressly granted him the opportunity after the hearing to move to reopen discovery, he has failed to do so.

1    to Plaintiff's *Monell* cause of action.  (*Id.* at 24-25).  According to the declaration

2    submitted by Plaintiff's counsel, Plaintiff intends to pursue "*Monell* discovery related to

3    arrests on and/or near the vicinity of City Hall (under the guise of California Penal Code

4    section 409, or bench warrants, among other potential charges) since 2009," and "any

5    investigations conducted by City officials into the arrest(s) of Plaintiff (and others) to

6    support his cause of action for ratification and failure to train, supervise, and discipline."

7    (Henriks Decl. ¶ 7).  Plaintiff states that without this "integral" discovery, "Plaintiff

8    cannot present all facts essential to support his opposition to the issues raised by

9    Defendants' pending motion for summary judgment," and will be "deprived of a trial on

10   the merits."  (*Id.* at 25).  Alternatively, Plaintiff has separately moved under C.D. Cal.

11   Local Rule 7-8 for authorization to cross-examine declarants Jones, Petterez, Stabile, and

12   Rossitter at the MSJ hearing, or to take their depositions following the hearing.  (Cross-

13   Exam. Req. at 2-4).  For the reasons stated below, the request for a continuance and the

14   request to cross-examine declarants are DENIED.

15

16           **1.    Rule 56(d)**

17

18           Federal Rule of Civil Procedure 56(d) provides that "[i]f a nonmovant shows by

19   affidavit or declaration that, for specified reasons, it cannot present facts essential to

20   justify its opposition, the court may:  (1) defer considering the motion or deny it; (2) allow

21   time to obtain affidavits or declarations or to take discovery; or (3) issue any other

22   appropriate order."  Fed. R. Civ. P. 56(d).  "The purpose of Rule 56(d) relief is to prevent

23   the nonmoving party from being 'railroaded' by a summary judgment motion that is filed

24   too soon after the start of a lawsuit for the nonmovant to properly oppose it without

25   additional discovery."  *Hollway Cleaners & Laundry Co., Inc. v. Cent. Nat'l Ins. Co. of

26   Omaha, Inc.*, 219 F. Supp. 3d 996, 1003 (C.D. Cal. 2016) (citing *Celotex Corp.*, 477 U.S.

27   at 326); *see also Weinberg v. Whatcom Cnty.*, 241 F.3d 746, 751 (9th Cir. 2001) ("[Rule

28   56(d)] thus protects parties from a premature grant of summary judgment.") (citing 10B

1  Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure

2  § 2740 (3d ed.1998)).

3

4       "A party requesting a continuance pursuant to Rule [56(d)] must identify by

5  affidavit the specific facts that further discovery would reveal, and explain why those facts

6  would preclude summary judgment." *Tatum v. City and Cnty. of San Francisco*, 441 F.3d

7  1090, 1100 (9th Cir. 2006); *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 921 (9th

8  Cir. 1996) ("The burden is on the party seeking additional discovery to proffer sufficient

9  facts to show that the evidence sought exists, and that it would prevent summary

10 judgment.") (internal citation omitted); *cf. Paddington Partners v. Bouchard*, 34 F.3d

11 1132, 1138 (2d Cir. 1994) (Rule 56(d) affidavit must "include the nature of the

12 uncompleted discovery; how the facts sought are reasonably expected to create a genuine

13 issue of material fact; what efforts the affiant has made to obtain those facts; and why

14 those efforts were unsuccessful").  The "[f]ailure to comply with the requirements of Rule

15 [56(d)] is a proper ground for denying discovery and proceeding to summary judgment."

16 *Brae Transp., Inc. v. Coopers & Lybrand*, 790 F.2d 1439, 1443 (9th Cir. 1986); *accord*

17 *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1000 (9th Cir. 2002); *see also*

18 *Weinberg*, 241 F.3d at 751 (plaintiff's "request in his memorandum in opposition to the

19 County's motion for summary judgment that the district court allow him" additional time

20 to file an expert report, without previously having filed a Rule 56(d) motion, "was plainly

21 inadequate").  Furthermore, "[t]o prevail on a Rule 56(d) motion, the movant must also

22 show diligence in previously pursuing discovery." *Painsolvers, Inc. v. State Farm Mut.*

23 *Auto. Ins. Co.*, 732 F. Supp. 2d 1107, 1124 (D. Haw. 2010); *Conkle v. Jeong*, 73 F.3d 909,

24 914 (9th Cir. 1995) ("[T]he district court does not abuse its discretion by denying further

25 discovery [under Rule 56(d)] if the movant has failed diligently to pursue discovery in the

26 past.") (internal quotation marks omitted).

27

28

1         Construed as a motion under Rule 56(d), Plaintiff's request for a "continuance"

2    utterly fails because counsel's declaration does not identify any *specific* facts that further

3    discovery would reveal, or explain why those facts would preclude summary judgment.

4    *See Tatum*, 441 F.3d at 1100 ("Absent a showing by [plaintiff] that additional discovery

5    would have revealed specific facts precluding summary judgment, the district court did

6    not abuse its discretion by denying [plaintiff's] request for a continuance under Rule

7    [56(d)]."). Instead, Plaintiff appears to believe that because he obtained counsel two

8    months after the close of fact discovery, he is entitled to re-open discovery generally to

9    engage in a fishing expedition, which is an improper use of Rule 56(d). *See Painsolvers*,

10   732 F. Supp. 2d at 1125 ("Rule [56(d)] is not a license for a fishing expedition in the

11   hopes that one might find facts to support its claims."); *Paddington Partners*, 34 F.3d at

12   1138 ("A court can reject a request for discovery, even if properly and timely made

13   through a Rule [56(d)] affidavit, if it deems the request to be based on speculation as to

14   what potentially could be discovered."); *Robinson v. Allstate Ins. Co.*, 706 F. Supp. 2d

15   320, 329-30 (W.D. N.Y. 2010) ("A continuance under Rule [56(d)] is not a license to go

16   fishing for evidence, in the hope of finding something that will support one's claims.

17   There must be some showing that the movant knows what facts he is after, and some

18   reasonable expectation not only that those facts can be found, but that they will create a

19   genuine issue of material fact.") (internal citation omitted); *Schaefer-LaRose v. Eli Lilly &*

20   *Co.*, 663 F. Supp. 2d. 674, 695 (S.D. Ind. 2009) ("When requesting additional discovery

21   pursuant to Rule [56(d)], plaintiffs must do more than request a fishing expedition to

22   hopefully find evidence that will allow them to make a case.") (internal quotation marks

23   and brackets omitted). Here, Plaintiff's Rule 56(d) request appears based on pure

24   speculation.

25

26        Even if Plaintiff had filed a declaration sufficient to show that he is not simply

27   hoping to conduct a fishing expedition, he still would not show an entitlement to a

28   continuance under Rule 56(d). As a preliminary matter, the purpose of Rule 56(d) -- to

1    prevent a party from being "railroaded" by a premature motion for summary judgment --

2    would not be served here.  Defendants' MSJ, filed one day before the dispositive motion

3    deadline and two months after the discovery cut-off, is in no way "premature."  Most

4    critically, however, Plaintiff admits that he did not even attempt to pursue any discovery

5    prior to the discovery cut-off, and therefore cannot show diligence.  Plaintiff offers no

6    excuse for his failure to propound discovery apart from his prior *pro se* status.  However,

7    Plaintiff is not an inexperienced litigant, as he has previously brought suit against the City

8    of Los Angeles, and prevailed.  Furthermore, *pro se* litigants routinely pursue discovery

9    and are responsible for prosecuting their case.  Even if Plaintiff could somehow not even

10   *begin* to pursue his claims without counsel (a dubious claim at best), his declaration does

11   not show any effort on his part to obtain counsel until long after the discovery cut-off.

12   Plaintiff's complete failure to seek *any* discovery prior to the cut-off, only to raise a

13   request for a continuance in an opposition to a summary judgment motion nearly three

14   years after the date Plaintiff initiated this action and four and a half months after the

15   discovery cut-off, is not the showing of diligence necessary to support a motion under

16   Rule 56(d).  The Court declines to reward Plaintiff's complete lack of diligence in

17   pursuing his claims.  The request for a continuance under Rule 56(d) is DENIED.[12]

18

19   ─────────────────
     [12] Plaintiff's request for a continuance would likely fare no better even if the Court were
20   to construe it as a motion to amend the Scheduling Order under Rule 16(b).  Pursuant to
     the Rule, "[a] [case management] schedule may be modified only for good cause and with
21   the judge's consent."  Fed. R. Civ. P. 16(b)(4).  Good cause requires a showing that the
     deadlines "'cannot reasonably be met despite the diligence of the party seeking the
22   extension.'"  *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir.1992)
     (quoting Fed. R. Civ. P. 16 advisory committee's notes (1983 amendment)).  If the party
23   seeking the modification was not diligent, "the inquiry should end." *Id*.

24   It is a "widely followed principle that '[t]he arrival of new counsel . . . does not entitle
     parties to conduct additional discovery or otherwise set aside valid and binding orders of
25   the court, regardless of the efficacy of any new strategy counsel seeks to follow.'"
     *Alvarado Orthopedic Research, L.P. v. Linvatec Corp.*, 2012 WL 6193834, at *3 (S.D.
26   Cal. Dec. 12, 2012) (citation omitted); *see also id.* ("With eyes wide open, counsel entered
     the fray. 'That new counsel is dissatisfied with the state of the case it inherited is not
27   grounds . . . for reopening discovery long after the court-ordered deadlines have passed.'")
     (quoting *Marcin Eng'g, LLC v. Founders at Grizzly Ranch, LLC*, 219 F.R.D. 516, 521 (D.
28   Colo. 2003)).  While some courts have considered a previously unrepresented plaintiff's
     *pro se* status as a factor supporting amendment of a scheduling order, they still require
     some showing of diligence by the *pro se* plaintiff prior to the retention of counsel.  *See,*

1            **2.**      **Local Rule 7-8**

2

3        In the alternative, Plaintiff moves to cross-examine Defendants' declarants at the

4 summary judgment hearing or to depose them shortly thereafter pursuant to C.D. Cal.

5 Local Rule 7-8. (*See generally* Cross-Exam. Req. at 2). The Request misconstrues the

6 purpose of the Local Rule, which provides in relevant part:

7

8          On motions for and orders to show cause re preliminary injunctions,

9          motions to be relieved from default and other motions where an issue of

10          fact is to be determined (e.g., civil contempt, but excluding motions

11          contesting venue and personal jurisdiction), not later than ten (10) calendar

12          days prior to the hearing, a party desiring to cross-examine any declarant

13          who is not beyond the subpoena power of the Court and who is reasonably

14          available to the party offering the declaration may serve by hand (or

15          facsimile or by electronic filing) and file a notice of request to cross-

16          examine such declarant.

17

18
---
19 *e.g.*, *Holmes v. Estock*, 2018 WL 934596, at \*2 (S.D. Cal. Feb. 16, 2018) (granting motion to continue expert discovery and dispositive motion deadlines where "even when Plaintiff was proceeding *pro se*, he was not dilatory in conducting discovery" as he had

20 propounded interrogatories and requests for admission, and newly-retained counsel moved quickly to continue the deadlines before the original deadlines expired); *Henderson v.*

21 *Peterson*, 2011 WL 441206, at \*1 (N.D. Cal. Feb. 3, 2011) (re-opening discovery after *pro se* prisoner obtained counsel where there was "no indication that Plaintiff . . . ha[d]

22 been dilatory in conducting discovery" and the record showed that plaintiff "made numerous attempts, albeit largely unsuccessfully, to obtain discovery from Defendants

23 prior to the appointment of counsel").

24 Here, despite his prior litigation experience, Plaintiff made no effort at all to propound any discovery at any time in any fashion. Similarly, Plaintiff's counsel waited *months* after

25 being retained even to request a continuance under Rule 56(d), and still has not moved to re-open discovery under Rule 16(b). Furthermore, while Plaintiff's lack of diligence is

26 dispositive in a Rule 16(b) analysis, *see Johnson*, 975 F.2d at 609, the prejudice to Defendants in having to delay even longer the resolution of this three-year old case that

27 puts at issue events that occurred nearly five years ago is patent. Accordingly, it does not appear that Plaintiff would be able to make a showing of good cause under Rule 16(b) had

28 he attempted to do so.

1   C.D. Cal. L.R. 7-8.

2

3        By its very terms, Local Rule 7-8 does not apply to motions for summary

4   judgment.  As one court explained in denying a cross-examination request under Local

5   Rule 7-8 in the context of summary judgment proceedings,

6

7        Although motions for summary judgment involve determining whether

8        there are genuine factual issues, the Court generally does not make factual

9        findings on such a motion.  The Court's role at the Summary Judgment

10       stage is not to weigh factual disputes and make findings, but rather to

11       determine whether genuine issues of fact remain.

12

13  *Nomadix, Inc. v. Second Rule LLC*, 2009 WL 10668158, at *5 (C.D. Cal. Jan. 16, 2009);

14  *see also Honse v. Shulkin*, 2019 WL 4308780, at *3 (C.D. Cal. July 25, 2019) (rejecting

15  plaintiff's contention that defendant violated Local Rule 7-8 by refusing to made a witness

16  available for cross-examination on the ground that plaintiff "does not have any right to

17  cross-examine Defendant's declarant under Local Rule 7-8" in summary judgment

18  proceedings); *Living on the Edge, LLC v. Lee*, 2015 WL 12712583, at *1 (C.D. Cal. Jan.

19  5, 2015) ("Local Rule 7-8 does not apply to hearings on motions for summary

20  judgment.").

21

22       The Local Rule that Plaintiff invokes does not apply in this proceeding.

23  Accordingly, Plaintiff's motion to cross-examine Defendants' declarants at the summary

24  judgment hearing is DENIED.

25

26

27

28

1

**B.**     **The Parties' Respective Evidentiary Objections Are Denied**

2

3      Plaintiff raises evidentiary objections to the declarations of Petterez, Stabile,

4   Rossiter, and O'Farrell, and to the evidence supporting many of Defendants' contentions

5   in their Statement of Undisputed Facts, on the grounds that the evidence contains hearsay,

6   lacks foundation, calls for speculation or a legal conclusion, and/or violates the best

7   evidence rule.[13]  (P Evid. Obj. at 2-40).  Defendants object to Plaintiff's declaration and

8   Plaintiff's "Additional Undisputed Facts," which largely mirror the declaration, as

9   "immaterial and irrelevant," and note that "Plaintiff cannot avoid summary judgment with

10   evidence that is essentially the allegations set forth in the complaint."  (Reply at 31)

11   (citing *Devereaux*, 263 F.3d at 1076).

12

13      Federal Rule of Civil Procedure 56(c)(2) provides that "[a] party may object that

14   the material cited to support or dispute a fact *cannot be presented* in a form that would be

15   admissible in evidence."  Fed. R. Civ. P. 56(c)(2) (emphasis added).  However, the Rule

16   "requires only that evidence 'would be admissible,' not that it presently be admissible."

17   *Burch v. Regents of Univ. of California*, 433 F. Supp. 2d 1110, 1120 (E.D. Cal. 2006).

18   The Ninth Circuit expressly instructs that "[a]t summary judgment, a party does not

19   necessarily have to produce evidence in a form that would be admissible at trial." *Nevada*

20   *Dep't of Corr. v. Greene*, 648 F.3d 1014, 1019 (9th Cir. 2011) (internal quotation marks

21   and citation omitted); *see also Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th

22   Cir. 2001) (to survive summary judgment, "a party does not necessarily have to produce

23   evidence in a form that would be admissible at trial, as long as the party satisfies the

24   requirements" of Fed. R. Civ. P. 56).  "Rule 56 is precisely worded to exclude evidence

25   only if it's clear that it *cannot be presented* in an admissible form at trial."  *Comite de*

26   *Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 964 n.7 (9th Cir.

27

---

28   [13] The declaration of Councilman Mitch O'Farrell, dated June 20, 2016, is attached to the TRO petition filed against Plaintiff on June 21, 2016, which is submitted as Exhibit 4 to Defendants' Request for Judicial Notice.  (RJN, Exh. 4 at 38-40) (continuous pagination).

2011) (emphasis added).  As a consequence, evidentiary rulings on summary judgment present unique challenges, because:

> even seemingly appropriate objections based on hearsay and failures to authenticate/lay a foundation are difficult to address away from the dynamics of a trial.  During trial, when a party raises valid evidentiary objections, the opposing party will have an opportunity to present the evidence in an alternative and admissible form.  At trial, a question can always be rephrased if an objection to it is sustained.  Not so in the context of summary judgment practice.

*Burch*, 433 F. Supp. 2d at 1122.

Therefore, when assessing evidence in support of or in opposition to a motion for summary judgment, the court must consider the admissibility of the evidence's contents, not its form.  *See Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) (contents of a diary may be considered on summary judgment because evidence of the events reported in the diary "could be admitted into evidence at trial in a variety of ways," whether or not the diary itself would be inadmissible hearsay); *see also JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016) ("[A]t summary judgment a district court may consider hearsay evidence submitted in an inadmissible form, so long as the underlying evidence could be provided in an admissible form at trial, such as by live testimony."); *Fonseca v. Sysco Food Servs. of Arizona, Inc.*, 374 F.3d 840, 846 (9th Cir. 2004) ("Even the declarations that do contain hearsay are admissible for summary judgment purposes because they 'could be presented in an admissible form at trial.'") (quoting *Fraser*, 342 F.3d at 1036); *Cheeks v. General Dynamics*, 22 F. Supp. 2d 1015, 1027 (D. Nev. 2014) ("Although Plaintiff's hearsay objection is likely to be well taken,

1   because the evidence could conceivably be converted into an admissible form for trial, the

2   Court will consider the evidence for the purposes of summary judgment.").

3

4          Further, objections to evidence on the grounds that it is immaterial or irrelevant

5   "are duplicative of the summary judgment standard itself" and are unnecessary in

6   summary judgment proceedings.  *Burch*, 433 F. Supp. 2d at 1119; *see also Anderson*, 477

7   U.S. at 248 ("As to materiality, the substantive law will identify which facts are

8   material. . . . Factual disputes that are irrelevant or unnecessary will not be counted.").

9   Similarly, objections that the opposing party's evidence lacks foundation, is

10  argumentative or speculative, or violates the "best evidence" rule merely challenge the

11  form of the opposing party's evidence and do not address whether the evidence *could* be

12  presented in an admissible form at trial.  *See Obesity Research Inst., LLC v. Fiber*

13  *Research Int'l, LLC*, 310 F. Supp. 3d 1089, 1107 (S.D. Cal. 2018) ("And while a court

14  will consider a party's evidentiary objections to a motion for summary judgment,

15  '[o]bjections such as lack of foundation, speculation, hearsay and relevance are

16  duplicative of the summary judgment standard itself.'") (citation omitted); *Garlick v.*

17  *Cnty. of Kern*, 167 F. Supp. 3d 1117, 1125 (E.D. Cal. 2016) (summarily dismissing as

18  improper on summary judgment "nearly blanket objections to the proffered evidence . . .

19  on the basis of relevance, hearsay, lack of foundation, lack of personal knowledge,

20  prejudice, improper character evidence, and assuming facts not in evidence" and noting

21  that the parties "may address evidentiary issues in pre-trial motions").

22

23         The parties' evidentiary objections do not explain why the proffered evidence

24  cannot be presented in an admissible form at trial.  Accordingly, all evidentiary objections

25  that are not specifically addressed in this Order are denied without prejudice as moot.  *See*

26  *PacifiCorp v. Northwest Pipeline GP*, 879 F. Supp. 2d 1171, 1194 n.7 & 1214 (D. Or.

27  2012) (declining to address evidentiary objections where the court would reach the same

28

1    conclusions whether or not it considered the challenged materials).  To the extent that the

2    Court does rely on any evidence objected to, the objections are OVERRULED.

3

4        **C.**        **Defendants' Request for Judicial Notice Is Granted**

5

6        Defendants ask the Court to take judicial notice of five documents:  (1) the notice

7    to appear issued to Plaintiff on November 10, 2015, for failure to disperse in violation of

8    Cal. Penal Code § 409, (RJN Exh. 1; Police Commission Incident); (2) the booking and

9    identification arrest record for Plaintiff issued on January 15, 2016, with attached abstracts

10   for warrants for unlawful vending (Cal. Penal Code § 854.7), suspended license failure to

11   appear (Cal. Veh. Code §§ 40508 (A) & 14601(A)), and resisting arrest and battery on a

12   police officer (Cal. Penal Code §§ 148(A)(l) & 242-243(B)), (RJN Exh. 2; City Hall

13   Incident); (3) certified court docket of proceedings in the matter of *The People of the State*

14   *of California vs. Michael Hunt*, Los Angeles County Superior Court Case No.

15   5WA01507, in which one of Plaintiff's bench warrants issued and which resulted in

16   Plaintiff's nolo contendere plea to one count of resisting arrest, (RJN Exh. 3; City Hall

17   Incident); (4) TRO petition for workplace violence restraining order against Plaintiff

18   pursuant to Cal. Code Civ. Proc. § 527.8, including supporting declarations of Hugo S.

19   Rossitter and Mitch O'Farrell, (RJN Exh. 4; TRO Incident); and (5) certified court

20   reporter's transcript of July 8, 2016 TRO proceedings in Los Angeles County Superior

21   Court Case No. BS162858, (RJN Exh. 5; TRO Incident).

22

23       Judicial notice may be taken "where the fact is 'not subject to reasonable dispute,'

24   either because it is 'generally known within the territorial jurisdiction,' or is 'capable of

25   accurate and ready determination by resort to sources whose accuracy cannot reasonably

26   be questioned.'"  *Castillo-Villagra v. I.N.S.*, 972 F.2d 1017, 1026 (9th Cir. 1992) (quoting

27   Fed. R. Evid. 201(b)).  A court "may take notice of proceedings in other courts, both

28   within and without the federal judicial system, if those proceedings have a direct relation

to matters at issue." *United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992).  A court may also take judicial notice of public records.  *See United States v. Daychild*, 357 F.3d 1082, 1099 (9th Cir. 2004) (district court may take judicial notice of the fact that an indictment was properly returned); *Victoria v. City of San Diego*, 326 F. Supp. 3d 1003, 1012 (S.D. Cal. 2018) (taking judicial notice of "reasonably undisputed facts such as the existence of [an arrest] warrant, its filing date, and the date of the stop and arrest at issue, among other things").

Plaintiff objects to RJN Exhibits 2, 3 and 4 largely on the grounds that the documents are not relevant and are not properly authenticated.  (Opp. RJN at 2-10).  Even if Plaintiff's relevancy objections were appropriate on summary judgment, they are unconvincing and at most appear to be directed to the weight the evidence should be accorded, which is an improper consideration on summary judgment.  *See Strong v. Valdez Fine Foods*, 724 F.3d 1042, 1046 (9th Cir. 2013) ("[T]he weight of the evidence is an issue for trial, not summary judgment.").  Similarly, Plaintiff's authentication arguments are not persuasive in the context of a summary judgment motion.  *See, e.g.*, *Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.*, 896 F.2d 1542, 1551 (9th Cir. 1990) (trial court's consideration of unauthenticated document on summary judgment harmless where a "competent witness with personal knowledge could authenticate the document" at trial); *Burch*, 433 F. Supp. 2d at 1120-21 (even if a document is not properly authenticated, it is improper to raise an objection on that ground "if the party nevertheless knows that the document is authentic") (quoting *Fenje v. Feld*, 301 F. Supp. 2d 781, 789 (N.D. Ill. 2003)).

All of the documents submitted with Defendants' RJN are public records properly subject to judicial notice.  *See Harris v. City of Fresno*, 625 F. Supp. 2d 983, 1010 n.11 (E.D. Cal. 2009) (taking judicial notice of the existence of court documents and other public records in support of defendant's motion for summary judgment).  However, even

1    when it is proper to take judicial notice of the existence of a public record, a court may not

2    take judicial notice of facts reflected in the record "that could reasonably be disputed" for

3    the truth of the matter asserted.  *United States v. Corinthian Colleges*, 655 F.3d 984, 999

4    (9th Cir. 2011).  Accordingly, subject to this limitation, Defendants' Request for Judicial

5    Notice is GRANTED.

6

7              **D.      Plaintiff's Federal Constitutional Claims**

8

9         Plaintiff brings constitutional claims under § 1983 alleging violations of his First

10   and Fourth Amendment rights with respect to the Police Commission Incident and his

11   First Amendment rights with respect to the TRO Incident.  Defendants are entitled to

12   summary judgment in their favor on all of these claims.

13

14             **1.      Standards for Individual and Municipal Liability under § 1983**

15

16             **a.      *Individual/Supervisory Liability***

17

18        To establish a civil rights violation by an individual defendant, a plaintiff must

19   show either the defendant's direct, personal participation in the constitutional violation, or

20   some sufficient causal connection between the defendant's conduct and the alleged

21   violation.  *See Starr v. Baca*, 652 F.3d 1202, 1205-06 (9th Cir. 2011).  Supervisors such as

22   Beck and Johnson are not liable for civil rights violations simply because their

23   subordinates engaged in unconstitutional conduct.  *See Ashcroft v. Iqbal*, 556 U.S. 662,

24   676 (2009).  Where a plaintiff names a supervisor as a defendant but does not allege that

25   the supervisor directly participated in the constitutional violation, a "sufficient causal

26   connection" to the violation may be shown where the supervisor "set 'in motion a series

27   of acts by others, or knowingly refused to terminate [such acts], which he knew or

28   reasonably should have known, would cause others to inflict the constitutional injury.'"

27

1    *Levine v. City of Alameda*, 525 F.3d 903, 907 (9th Cir. 2008) (quoting *Larez v. City of Los*

2    *Angeles*, 946 F.2d 630, 646 (9th Cir. 1991)).  "Thus, a supervisor may 'be liable in his

3    individual capacity for his own culpable action or inaction in the training, supervision, or

4    control of his subordinates; for his acquiescence in the constitutional deprivation; or for

5    conduct that showed a reckless or callous indifference to the rights of others.'"  *Rodriguez*

6    *v. Cnty. of Los Angeles*, 891 F.3d 776 (9th Cir. 2018) (quoting *Keates v. Koile*, 883 F.3d

7    1228, 1243 (9th Cir. 2018)).  For example, a "claim that a supervisory official knew of

8    unconstitutional conditions and 'culpable actions of his subordinates' but failed to act

9    amounts to 'acquiescence in the unconstitutional conduct of his subordinates' and is

10   'sufficient to state a claim of supervisory liability.'"  *Keates*, 883 F.3d at 1243 (quoting

11   *Starr*, 652 F.3d at 1208).

12

13                    **b.      *Municipal Liability***

14

15        It is well established that a municipality may be held liable under Section 1983

16   only for constitutional violations occurring as the result of an official government policy,

17   practice, or custom.  *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 121 (1992);

18   *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978).  "Official

19   municipal policy includes the decisions of a government's lawmakers, the acts of its

20   policymaking officials, and practices so persistent and widespread as to practically have

21   the force of law."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citing *Pembaur v.*

22   *Cincinnati*, 476 U.S. 469, 480-81 (1986)).  As the Ninth Circuit has explained,

23

24        A section 1983 plaintiff may establish municipal liability in one of three

25        ways.  First, the plaintiff may prove that a city employee committed the

26        alleged constitutional violation pursuant to a formal governmental policy or

27        a "longstanding practice or custom which constitutes the 'standard

28        operating procedure' of the local governmental entity."   Second, the

1    plaintiff may establish that the individual who committed the constitutional

2    tort was an official with "final policy-making authority" and that the

3    challenged action itself thus constituted an act of official governmental

4    policy.  Whether a particular official has final policy-making authority is a

5    question of state law.  Third, the plaintiff may prove that an official with

6    final policy-making authority ratified a subordinate's unconstitutional

7    decision or action and the basis for it.

8

9    *Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992) (internal citations omitted).

10   As a general matter, proof of a single incident of unconstitutional activity, or even a series

11   of 'isolated and sporadic incidents,'" will not impose liability under section 1983 based on

12   unconstitutional policies or practices.  *Gant v. County of Los Angeles*, 772 F.3d 608, 618

13   (9th Cir. 2014) (quoting *Okla. City v. Tuttle*, 471 U.S. 808, 823-24 (1985)).  Rather,

14   liability must generally be "founded upon practices of sufficient duration, frequency and

15   consistency that the conduct has become a traditional method of carrying out policy."

16   *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).  Similarly, "unconstitutional

17   discretionary actions of municipal employees generally are not chargeable to the

18   municipality under section 1983."  *Gillette*, 979 F.2d at 1347.  However, "where action is

19   directed by those who establish governmental policy, the municipality is equally

20   responsible whether that action is to be taken only once or to be taken repeatedly."

21   *Pembaur*, 475 U.S. at 481.

22

23       There must be a "'direct causal link between a municipal policy or custom and the

24   alleged constitutional deprivation.'"  *Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d

25   950, 957 (9th Cir. 2008) (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)).

26   Furthermore, the municipality's offending act or omission must reflect a deliberate

27   decision.  *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 415

28   (1997); *see also Gillette*, 979 F.2d at 1347 (for municipal liability under § 1983 to lie,

1   "[t]here must . . . be evidence of a conscious, affirmative choice" among various

2   alternatives by the city).

3

4                    **2.      Plaintiff's Fourth Amendment Claim**

5

6           The only surviving Fourth Amendment claim in this action arises from Plaintiff's

7   warrantless arrest in the Police Commission Incident.  The claim is brought against all

8   Defendants, and fails as to all of them.

9

10                   **a.      *Standard***

11

12          The Fourth Amendment protects the "[t]he right of . . . people to be secure in their

13  persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S.

14  Const. amend. IV.  "A seizure results in a constitutional violation only if it is

15  unreasonable."  *Nelson v. City of Davis*, 685 F.3d 867, 878 (9th Cir. 2012).  "A claim for

16  unlawful arrest is cognizable under § 1983 as a violation of the Fourth Amendment,

17  provided the arrest was without probable cause or other justification."  *Dubner v. City and*

18  *Cnty. of San Francisco*, 266 F.3d 959, 964 (9th Cir. 2001).

19

20          "Probable cause for a warrantless arrest arises when the facts and circumstances

21  within the officer's knowledge are sufficient to warrant a prudent person to believe that

22  the suspect has committed, is committing, or is about to commit an offense."  *Lingo v.*

23  *City of Salem*, 832 F.3d 953, 960 (9th Cir. 2016) (quoting *Crowe v. Cnty. of San Diego*,

24  608 F.3d 406, 432 (9th Cir. 2010)); *see also United States v. Lopez*, 482 F.3d 1067, 1072

25  (9th Cir. 2007) ("Probable cause is an objective standard.").  Where the arresting officers

26  had probable cause to arrest, the officers' subjective motivations for the arrest are

27  immaterial for purposes of the Fourth Amendment.  *Id.*; *see also Devenpeck v. Alford*, 543

28  U.S. 146, 153 (2004) ("Our cases make clear that an arresting officer's state of mind

1   (except for the facts that he knows) is irrelevant to the existence of probable cause. . . .

2   [H]is subjective reason for making the arrest need not be the criminal offense as to which

3   the known facts provide probable cause.") (citations omitted); *Whren v. United States*, 517

4   U.S. 806, 814 (1996) ("[T]he Fourth Amendment's concern with 'reasonableness' allows

5   certain actions to be taken in certain circumstances, *whatever* the subjective intent.")

6   (emphasis in original).  However, the Ninth Circuit instructs that "[i]n some instances

7   there may initially be probable cause justifying an arrest, but additional information

8   obtained at the scene may indicate that there is less than a fair probability that the

9   defendant has committed or is committing a crime.  In such cases, execution of the arrest

10  or continuation of the arrest is illegal."  *United States v. Lopez*, 482 F.3d 1067, 1073 (9th

11  Cir. 2007).

12

13          **b.      *The Police Commission Incident (Beck, Johnson and the***

14          ***City)***

15

16                  (1)     Beck and Johnson

17

18          Plaintiff alleged in the SAC that Johnson and Beck "*directed* the arrest of the

19  Plaintiff."  (SAC ¶ 30) (emphasis added).  Based on that allegation, the Court

20  recommended that Plaintiff's Fourth Amendment claim be allowed to proceed.  (*See*

21  R&R, Dkt. No. 60 at 27-28 ("Plaintiff alleges that Beck and Johnson directed that he be

22  arrested in the Police Commission Incident to punish him for his political advocacy, even

23  though he had done nothing wrong and was attempting to comply with the order to

24  disperse when he was arrested.  (SAC ¶¶ 30-35).  Allegations that Plaintiff was arrested

25  without a warrant and without probable cause are sufficient to state a Fourth Amendment

26  violation with respect to that Incident.")).

27

28

31

1         However, on summary judgment, Plaintiff has presented absolutely no evidence of

2   Beck's and Johnson's purported involvement in effecting his arrest, either directly or in

3   their supervisory capacities.  The *only* mention of Beck at all in Plaintiff's declaration is in

4   the list of defendants in the caption.  (Hunt Decl. at 1).  While Plaintiff's declaration

5   contains two brief substantive references to Johnson, neither shows any involvement by

6   Johnson in ordering Plaintiff's arrest.  Plaintiff states:  "Defendant Johnson abruptly

7   recessed the [Police Commission] meeting when members of the Black Lives Matter

8   movement voiced their concerns. . . . Defendant Johnson did not adjourn or terminate the

9   meeting.  There was no quorum vote to be able to recess and/or close the meeting.  Yet,

10  the meeting was 'recessed,' nonetheless."  (*Id.* ¶ 16).  That Johnson called a recess of the

11  meeting explains why Plaintiff was in the lobby at the time of his arrest, but does not

12  show that Johnson had any connection whatsoever to Plaintiff's arrest.  There is no triable

13  issue regarding the fact that neither Beck nor Johnson was in the lobby during the Police

14  Commission Incident, including Plaintiff's arrest.  (*See* Jones Decl. ¶ 13; Stabile Decl.

15  ¶ 17).  Plaintiff has not controverted Stabile's testimony that neither Beck nor Johnson

16  ordered him to arrest Plaintiff or communicated with him about punishing Plaintiff for his

17  First Amendment activities.  (Stabile Decl. ¶ 17).   Indeed, there is no evidence before the

18  Court showing that Beck or Johnson even knew what was happening in the lobby, much

19  less that Johnson recessed the meeting for the purpose of having Plaintiff arrested, or in

20  the expectation that his arrest would occur.  Plaintiff has not made "a showing sufficient

21  to establish the existence of an element essential to [his] case, and on which [he] will bear

22  the burden of proof at trial."  *Celotex Corp.*, 477 U.S. at 322.  Accordingly, it is

23  recommended that Defendants' MSJ be granted in favor of Beck and Johnson on

24  Plaintiff's Fourth Amendment claim.

25

26

27

28

1

2

(2)     The City

3          Similar failures of proof beset Plaintiff's Fourth Amendment *Monell* claim against

4    the City.  Plaintiff has not presented any evidence showing that an official with "final

5    policy-making authority" either ordered Plaintiff's arrest or ratified Stabile's decision to

6    have Plaintiff arrested.  *Gillette*, 979 F.2d at 1346-47.  Accordingly, to survive summary

7    judgment, Plaintiff must show that there is a triable issue of fact as to whether Plaintiff

8    was arrested pursuant to a "longstanding practice or custom which constitutes the

9    'standard operating procedure' of the local governmental entity."  *Id.* at 1346.  However,

10   Plaintiff does not identify an unlawful policy or practice with a "direct causal link" to his

11   arrest, or, just as importantly, provide any *evidence* that such a policy or practice actually

12   exists.  *Villegas*, 541 F.3d at 957.  Indeed, Plaintiff's admission that he has spoken at over

13   200 meetings wearing his "political garb," (Hunt Decl. ¶ 8), would appear to controvert

14   any contention that an unlawful longstanding policy or practice led to Plaintiff's arrest in

15   the Police Commission Incident.  *Gillette*, 979 F.2d at 1346.  All of Defendants'

16   declarants affirmatively testified that they are unaware of any City policy to discriminate

17   against Plaintiff and did not act pursuant to such a policy.  (Stabile Decl. ¶ 18; Jones Decl.

18   ¶ 13; Petterez Decl. ¶ 11; Rossitter Decl. ¶ 9).

19

20         Instead, Plaintiff appears to argue for the first time in this action that, as a matter of

21   law, the dispersal order in this particular protest was unlawful, and as such, so was

22   Plaintiff's arrest.  (Opp. MSJ at 9-12).  Even if it were true that the declaration of an

23   unlawful assembly somehow violated California law, it would appear that Plaintiff would,

24   on this record, be able to show at most only "proof of a single incident of unconstitutional

25   activity," which is insufficient to establish a triable fact as to the existence of an

26   unconstitutional *policy or practice*.  *Gant*, 772 F.3d at 618.

27

28

33

1    Nonetheless, even if Plaintiff were able to create a triable issue of fact as to the
2    existence of a relevant City policy or practice, the Video clearly and uncontrovertibly
3    shows that Stabile had probable cause to order Plaintiff's arrest.  As reflected in the
4    Video, the facts and circumstances known to Stabile were sufficient "to warrant a prudent
5    person to believe" that Plaintiff was violating the dispersal order.  *Lingo*, 832 F.3d at 960.
6    At 7:00 minutes into the Video, Stabile began speaking into a megaphone to declare an
7    unlawful assembly.  By 8:15, Plaintiff was standing next to Spindler, facing Stabile.  At
8    8:25, while Plaintiff was looking at Stabile, Stabile announced that the public had two
9    minutes to vacate the building.  Stabile finished speaking at approximately 8:33.  By the
10   time Stabile finished speaking, most, but not all, of the activists had exited the building in
11   compliance with his order.

12

13   Plaintiff then walked up closer to Stabile to speak to him.  At approximately 8:47,
14   Plaintiff told Stabile, "I got a 409 [citation]," which he repeated at 8:57, holding out some
15   papers toward Stabile.  At 9:00, Plaintiff stated that he got a 409 and the City paid him
16   $215,000 for it.  At 9:05, still showing his papers to Stabile, Plaintiff said, "I got a 409
17   before and the City ended up paying me $215,000 for this 409."  At 9:16, while Plaintiff
18   was standing feet away from Stabile and facing in his direction, Stabile issued his second
19   warning, "Ladies and gentlemen, I need you to leave the lobby."  At 9:23, Plaintiff told
20   Stabile, "I got a 409."  At 9:29, Plaintiff asked, while holding up the same papers, "are
21   you going to do that again?"  At 9:35, Plaintiff turned a few steps towards the press and
22   said, "hey guys, I got a 409."  At 9:44 he lifted his papers above his head, while repeating
23   that he had a 409, and continued to do so until approximately 10:08.[14]  At 10:16, while

24

_____

25   [14] Shortly before 10:00, a woman approached the officers and appeared to be asking
     permission to go into chambers to retrieve a white bag.  She was denied permission, and at
26   10:25 can be seen walking toward the exit.  She stood well away from Plaintiff and
     Spindler, behind the press, but did not exit.  As officers moved toward Plaintiff and
27   Spindler to effect their arrest, she returned to pick up an item by the wall and left.  For
     approximately 30 seconds before officers walked up to Plaintiff and Spindler to arrest
28   them, only Plaintiff and Spindler appeared to be in the area directly in front of the officers,
     with the press standing on the periphery.

34

1    still lifting his papers above his head, Plaintiff told the press that the City paid him

2    $215,000 for that 409.  At 10:23, Plaintiff walked back toward Stabile and faced him,

3    standing next to Spindler.  At 10:24, approximately two minutes after Stabile issued the

4    order to disperse, Plaintiff asked, "is the meeting over?"  At 10:29, Plaintiff lifted the

5    papers and, facing Stabile, stated, "I got a 409 before.  The City paid $215,000 for it."  At

6    10:40, Plaintiff asked once again, "is the meeting over?"  By this point, the lobby was

7    largely empty except for the officers, the press, and Plaintiff and Spindler.  At 10:55,

8    officers walked up to Plaintiff and handcuffed him and Spindler.  At 11:20, Plaintiff said,

9    "Michael Hunt's been arrested for 409 twice now."  At 11:40, Plaintiff stated to the

10   camera, "The No. 1 political activist in the country.  They already paid me $215,000 for

11   the same thing.  We were just asking was the meeting over."

12

13        Despite Plaintiff's contentions that he could not hear everything that Stabile said in

14   the unlawful assembly declaration and was distracted by his conversation with another

15   activist, (Hunt Decl. ¶ 26), the Video unambiguously shows that Plaintiff was aware of the

16   order to disperse and chose to remain in the lobby in violation of the order.  Following

17   Stabile's announcement of the dispersal order, Plaintiff immediately -- and repeatedly --

18   began referring to his prior "409," and he witnessed the other activists' departure.  "When

19   opposing parties tell two different stories, one of which is blatantly contradicted by the

20   record, so that no reasonable jury could believe it, a court should not adopt that version of

21   the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550

22   U.S. 372, 380 (2007); *see also Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010)

23   ("[W]hen the facts, as alleged by the non-moving party, are unsupported by the record

24   such that no reasonable jury could believe them, [this Court] need not rely on those facts

25   for purposes of ruling on the summary judgment motion.").

26

27        The Video also shows that Plaintiff was making no movement toward leaving the

28   lobby at the time of his arrest, and in fact had just walked closer to Stabile, facing him.

1   Plaintiff's attempts to create a triable issue of by arguing that the meeting was recessed in

2   violation of the rules, that only two people should have been ejected from the meeting

3   instead of the public, that he did not witness a "riot" in the lobby, and that he did not

4   personally block or prevent anyone from accessing the front desk or metal detectors, are

5   simply irrelevant.  (*See* Hunt Decl. ¶¶ 16-25).  Plaintiff knew of Stabile's dispersal order

6   and chose to ignore it.  Even if Plaintiff had identified and provided evidence of a

7   municipal policy or practice, no reasonable juror could find a violation of Plaintiff's

8   Fourth Amendment rights on these facts.  Accordingly, it is recommended that

9   Defendants' MSJ also be granted in favor of the City on Plaintiff's Fourth Amendment

10  claim.

11

12                          **3.       Plaintiff's First Amendment Claims**

13

14          Plaintiff raises First Amendment retaliation claims based on his arrest in the Police

15  Commission Incident and the City's unsuccessful attempt to obtain a workplace

16  restraining order against him in the TRO Incident.  The retaliation claim arising from the

17  Police Commission Incident is brought against all Defendants, while the retaliation claim

18  arising from the TRO Incident is brought against the City alone.  All of Plaintiff's First

19  Amendment claims fail.

20

21                          **a.       *Standard***

22

23          "The essential thrust of the First Amendment is to prohibit improper restraints on

24  the voluntary public expression of ideas; it shields the man who wants to speak or publish

25  when others wish him to be quiet."  *Harper & Row, Publishers, Inc. v. Nation Enters.*,

26  471 U.S. 539, 559 (1985) (internal quotation marks and emphasis omitted).  "Political

27  speech, of course, is 'at the core of what the First Amendment is designed to protect.'"

28  *Morse v. Frederick*, 551 U.S. 393, 403 (2007) (quoting *Virginia v. Black*, 538 U.S. 343,

365 (2003) (plurality opinion)).  Accordingly, "[t]he First Amendment forbids government officials from retaliating against individuals for speaking out." *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010) (citing *Hartman v. Moore*, 547 U.S. 250, 256 (2006)).

To prevail on a claim for retaliation under the First Amendment, a plaintiff must show that "by his actions [the defendant] deterred or chilled [the plaintiff's] political speech and such deterrence was a substantial or motivating factor in [the defendant's] conduct . . . ." *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 917 (9th Cir. 2012) (internal quotation marked omitted; brackets in original)).  Specifically, the plaintiff must show: "(1) he engaged in constitutionally protected activity; (2) as a result, he was subjected to adverse action by the defendant that would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action." *Blair*, 608 F.3d at 543 (footnote omitted).

"The defendant's intent is an element of the claim." *Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 14 F.3d 457, 464 (9th Cir. 1994) ("*Mendocino I*") (emphasis omitted). The plaintiff must "'prove the elements of retaliatory animus as the cause of injury,' with causation being 'understood to be but-for causation.'" *Lacey*, 694 F.3d at 917 (quoting *Hartman*, 547 U.S. at 260); *see also Dietrich v. John Ascuaga's Nugget*, 548 F.3d 892, 901 (9th Cir. 2008) (defendant's desire to cause the chilling effect must be a "but-for cause" of defendant's action).  If no chilling occurred, or if a person of "ordinary firmness" would not have been silenced from future speech, there is no retaliation claim. *Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999) ("*Mendocino II*").  Furthermore, "[a] plaintiff 'may not recover merely on the basis of a speculative 'chill' due to generalized and legitimate law enforcement initiatives.'" *Mendocino I*, 14 F.3d at 464 (internal quotation marks and citation omitted).

1            **b.**    ***The Police Commission Incident (Beck, Johnson, the City)***

2

3          In the SAC, Plaintiff alleges that "the 'unlawful assembly' [declaration in the

4 Police Commission Incident] and [his] arrest were just pretexts towards [him] so that [he]

5 wouldn't be able to speak at the meeting.  Johnson was pushing for himself important

6 agenda items."  (SAC ¶ 14).  Accordingly, Plaintiff appears to argue that Defendants

7 arrested him as a pre-emptive measure to ensure that he would not speak at the Police

8 Commission meeting and derail Johnson's agenda.

9

10                      (1)    Beck and Johnson

11

12          Like Plaintiff's Fourth Amendment claim, his First Amendment claim against Beck

13 and Johnson was predicated on the contention that those two Defendants ordered

14 Plaintiff's arrest in order to retaliate against him for his political activism.  (SAC ¶ 30).

15 Based on that allegation, the Court concluded that the Second Amended Complaint

16 adequately stated a First Amendment claim against all three Defendants, stating, "[t]he

17 allegation that Beck and Johnson ordered Plaintiff's arrest shows that the Individual

18 Defendants participated in the violation and that the officers who effected the arrest were

19 acting pursuant to policy-maker level orders.  No more is required to state a First

20 Amendment claim against Beck and Johnson in their individual capacities and against the

21 City under *Monell*."  (R&R, Dkt. 60 at 20).  However, as noted above, Plaintiff has

22 presented absolutely no evidence showing Beck's or Johnson's connection to his arrest in

23 the Police Commission Incident, either directly or in their supervisory capacities.

24 Accordingly, it is recommended that Defendants' MSJ be granted in favor of Beck and

25 Johnson with respect to Plaintiff's First Amendment claim based on the Police

26 Commission incident.

27

28

(2)     The City

Similarly, Plaintiff's failure to identify a person with policy-making authority who ordered or ratified Plaintiff's arrest in the Police Commission Incident, or a policy or practice that directly caused the violation, dooms Plaintiff's First Amendment claim against the City as well.  Even if Plaintiff had identified a relevant policy or practice and provided evidence sufficient to create a triable fact as to the existence of the policy or practice, there is simply no evidence that Plaintiff's arrest in the Police Commission Incident occurred for the purpose of chilling his First Amendment activities.  The dispersal order applied to all persons present, not just Plaintiff.  There is no evidence that Stabile declared an unlawful assembly for the purpose of arresting Plaintiff, knowing that Plaintiff would resist his order, or that Plaintiff would have been arrested whether or not he ignored the dispersal order.

Plaintiff has not created a triable issue of fact as to any of the elements of a First Amendment claim.  First, while his attendance at the Police Commission meeting was constitutionally protected, the activity for which he was arrested -- defiance of a dispersal order -- was not.  *Blair*, 608 F.3d at 543.  Second, although he was subjected to an adverse action, *i.e.*, his arrest, an arrest for violation of a dispersal order would not "chill a person of ordinary firmness from continuing to engage in" a protected activity because the activity for which Plaintiff was arrested was not protected.  *Id.* Even if the Court were to construe the "protected activity" as the right to speak at public meetings, Plaintiff's arrest for failing to disperse would not chill a "person of ordinary firmness" from exercising his free speech rights.  In order to avoid arrest, Plaintiff need only have complied with the dispersal order and waited outside with the rest of the activists until the meeting reconvened.  Third, Plaintiff has not provided evidence showing "a substantial causal relationship between the constitutionally protected activity and the adverse action." *Id.* Plaintiff's arrest occurred because he plainly and intentionally violated Stabile's dispersal

39

1    order.  Further, Plaintiff cannot plausibly argue that this arrest, for which criminal charges

2    were not brought, had a chilling effect on the exercise of his First Amendment rights,

3    because by his own estimation, Plaintiff has spoken at some 200 meetings and continues

4    to do so.  Plaintiff has not created a triable issue as to whether, as he alleged in the SAC,

5    "the unlawful assembly' and arrest were just pretexts" designed to prevent him from

6    speaking at the meeting.  (*See* SAC at 9).  Accordingly, it is recommended that

7    Defendants' MSJ also be granted in favor of the City on Plaintiff's First Amendment

8    claim arising from the Police Commission Incident.

9

10                           **c.       *The TRO Incident (the City)***

11

12          Plaintiff's First Amendment claim against the City arising from the TRO Incident

13   equally fails.  Plaintiff alleges in the SAC that the City applied for a restraining order "for

14   the specific purpose of preventing him from lawfully attending City Council and City

15   Council Committee meetings."  (SAC ¶ 21).  That allegation is demonstrably false.  The

16   City's TRO Petition specifically stated that Plaintiff "may attend any City of LA public

17   meetings and may engage in public comment in accord with City Council rules and

18   procedures."  (Rossitter Decl. at 10) (continuous pagination).  The requested restraining

19   order would have required Plaintiff to come no closer than 10 yards from O'Farrell in City

20   Hall, including during City Council meetings, two yards from O'Farrell's office, and 100

21   yards from O'Farrell's home.  (*Id.*).  Even if the City's TRO petition had been granted,

22   which it was not, Plaintiff's First Amendment rights would still have been protected.  And

23   while the Superior Court ultimately determined that the City had not met its burden, the

24   Court specifically admonished Plaintiff not to get "too close" to O'Farrell when exercising

25   his First Amendment rights or to follow him outside of City Hall, and extracted a promise

26   from Plaintiff that he would not do so.  (RJN, Exh. 5 at 53-54).

27

28

                                              40

1    In light of the specific carve-out in the TRO petition to protect Plaintiff's right to

2    speak at public meetings and engage in public comment, Plaintiff does not, and seemingly

3    cannot, create a triable issue as to whether the City took an adverse action against him for

4    the purpose of chilling his First Amendment rights.  Accordingly, it is recommended that

5    Defendants' MSJ be granted in favor of the City on Plaintiff's First Amendment claim

6    arising from the TRO Incident.

7

8    **E.     Plaintiff's State Law Claims**

9

10    Plaintiff brings state law claims under the Bane Act arising from the Police

11    Commission and TRO Incidents and the common law tort of false imprisonment arising

12    from the Police Commission and City Hall Incidents.  All of Plaintiff's state law claims

13    are brought against the City alone.  However, the Court recommends that Defendants'

14    motion for summary judgment be granted on all of Plaintiff's federal claims over which

15    the Court had original jurisdiction.  Accordingly, the Court must decide whether to

16    continue to exercise supplemental jurisdiction over Plaintiff's state law claims.

17

18    28 U.S.C. § 1367(a) provides:

19

20    in any civil action of which the district courts have original jurisdiction, the

21    district courts shall have supplemental jurisdiction over all other claims that

22    are so related to claims in the action within such original jurisdiction that

23    they form part of the same case or controversy under Article III of the

24    United States Constitution.

25

26    Under 28 U.S.C. § 1367(c)(3), when all federal claims are eliminated before trial, the

27    court has discretion to decide whether to continue exercising supplemental jurisdiction

28    over any remaining state claims.  *Les Shockley Racing, Inc. v. National Hot Rod Ass'n*,

1    884 F.2d 504, 509 (9th Cir. 1989); *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 561 (9th

2    Cir. 2010) ("A district court 'may decline to exercise supplemental jurisdiction' if it 'has

3    dismissed all claims over which it has original jurisdiction.'") (quoting 28 U.S.C.

4    § 1367(c)(3)).  "[W]hen deciding whether to exercise supplemental jurisdiction, a federal

5    court should consider and weigh in each case, . . . the values of judicial economy,

6    convenience, fairness, and comity."  *City of Chicago v. Int'l College of Surgeons*, 522

7    U.S. 156, 173 (1997).  However, "[i]n the usual case in which all federal-law claims are

8    eliminated before trial, the balance of factors to be considered . . . will point toward

9    declining to exercise jurisdiction over the state-law claims."  *Carnegie-Mellon Univ. v.*

10   *Cohill*, 484 U.S. 343, 350 n.7 (1988); *Acri v. Varian Assoc., Inc.*, 114 F.3d 999, 1001 (9th

11   Cir. 1997) (en banc) (quoting same); *Wade v. Regional Credit Assoc.*, 87 F.3d 1098, 1101

12   (9th Cir. 1996) ("Where a district court dismisses a federal claim, leaving only state

13   claims for resolution, it should decline jurisdiction over the state claims and dismiss them

14   without prejudice."); *Berg v. California Horse Racing Bd.*, 419 F. Supp. 2d 1219, 1233-34

15   (E.D. Cal. 2006) (declining to exercise supplemental jurisdiction over state law claims

16   after granting summary judgment in favor of defendants on all of plaintiff's § 1983

17   claims).

18

19        Here, should the Court accept the recommendations in this Report, no federal

20   claims survive.  Furthermore, the only relief available to Plaintiff on his state law claims

21   is injunctive or declaratory relief,[15] and the prayers for equitable relief in the SAC are

---

[15] Plaintiff did not present his state law claims to the City prior to filing this action. Accordingly, pursuant to California's Government Claims Act, even if his Bane Act and false imprisonment claims were to survive summary judgment, the only relief available to him would be declaratory or injunctive relief, not monetary damages.  *See* Cal. Gov't Code § 945.4 ("[N]o suit for money or damages may be brought against a [local] public entity . . . until a written claim therefor has been presented to the public entity . . . ."); *Sparks v. Kern Cnty. Bd. of Supervisors*, 173 Cal. App 4th 794, 798 (2009) ("[A] party need not comply with the Government Claims Act when bringing an action for . . . injunctive or declaratory relief where monetary relief is merely incidental to the primary relief sought."); *Roy v. Cnty. of Los Angeles*, 114 F. Supp. 3d 1030, 1036 (C.D. Cal. 2015) ("Because [plaintiff] seeks only injunctive and declaratory relief, his failure to allege compliance with the [California Government] Claims Act's presentation requirements provides no basis for the dismissal of his claims.") (internal record citation omitted).

either patently unrelated to *any* claim raised in this action, or so vague as to be unenforceable.  For example, Plaintiff seeks a declaration that the "City's Rules" violate various state and federal constitutional rights and "the Brown Act."  (SAC at 23).  However, the City's Rules of Decorum, which were at issue in Plaintiff's *prior* action against the City, are not implicated by any of the Incidents at issue in this action, and Plaintiff has not raised a Brown Act claim.  Similarly, Plaintiff prays for an "Order directing that the May 13, 2016 citation to Plaintiff for violation of Penal Code Section 409 be expunged," even though none of the Incidents in this action occurred on May 13, 2016.[16]  (*Id.*).  Plaintiff also seeks injunctions prohibiting Defendants "from enforcing the Law, including the Rules [of Decorum] and Penal Code[,] to deny the right to assemble and speak at such meetings" and from any "further attempts to file these So called 'Workplace Violence TROs' under State law," which are hopelessly vague and patently overbroad.  (*Id.* at 22-23).  Finally, obvious comity concerns arise should the Court be required to resolve Plaintiff's state law claims in the absence of any federal claim based on the same facts, particularly if the state law claims implicate potentially unsettled or ambiguous areas of state law.

The Court recognizes that when it granted in part Defendants' Motion to Dismiss the Second Amended Complaint on December 12, 2019, it dismissed the federal claims arising from the City Hall Incident, but not the false imprisonment claim arising from the same Incident, even though it arose solely under state law.  (*See* Dkt. No. 60 at 48-50 (Report and Recommendation recommending dismissal of First and Fourth Amendment claims based on City Hall Incident but not the false imprisonment claim), and Dkt. No. 65 (Order Accepting Report and Recommendation)).  However, the Court did not *sua sponte*

---

[16] As Defendants noted in their motion to dismiss the Second Amended Complaint, Plaintiff appears to have copied this part of his prayer for relief from pleadings filed by third party Wayne Spindler, who was arrested on that date.  (*See* Dkt. No. 47 at 4).

1  raise the issue of supplemental jurisdiction with respect to the sole surviving City Hall

2  Incident claim, and the parties did not brief it.

3

4          The Court concludes that because no federal issue arising from the City Hall

5  Incident survived the motion to dismiss, the Court could, and should, have dismissed the

6  City Hall Incident false imprisonment claim when it dismissed the related federal claims.

7  Nonetheless, because Plaintiff did not pursue *any* discovery on *any* claim, including the

8  City Hall Incident, the Court finds that Plaintiff will not be prejudiced by the Court's

9  decision to decline to exercise supplemental jurisdiction over that claim now.[17]

10 _____

11 [17] Furthermore, it is questionable whether any state law claims for false imprisonment are timely under the state statute of limitations, which further supports the Court's conclusion that Plaintiff will not be prejudiced if the Court declines to exercise supplemental

12 jurisdiction. "State law claims, even though brought in federal court, are subject to state statutes of limitation." *Jamali v. Marin*, 2005 WL 8160727, at *2 (D. Ariz. July 22,

13 2005). California's two-year statute of limitations applies to personal injury actions, *see* Cal. Civ. Proc. Code § 335.1, and therefore to § 1983 claims. *Bird v. Dep't of Human*

14 *Servs.*, 935 F.3d 738, 743 (9th Cir. 2019), cert. denied sub nom. *Bird v. Hawaii*, 140 S. Ct. 899 (2020) ("Because 42 U.S.C. § 1983 does not contain its own statute of limitations,

15 '[a]ctions brought pursuant to 42 U.S.C. § 1983 are governed by the forum state's statute of limitations for personal injury actions.'") (quoting *Knox v. Davis*, 260 F.3d 1009, 1012-

16 13 (9th Cir. 2001)). However, California provides a *one-year* statute of limitations for false imprisonment claims. *See* Cal. Civ. Proc. Code § 340(c); *see also Robles v.*

17 *Agreserves, Inc.*, 158 F. Supp. 3d 952, 988 (E.D. Cal. 2016) ("There is a one year statute of limitations for false imprisonment claims.") (citing Cal. Civ. Proc. Code § 340(c));

18 *Stavropoulos v. Superior Court*, 141 Cal. App. 4th 190, 194 (2006) (§ 340(c), as amended in 2002, "provides a one-year limitations period for '[a]n action for . . . false

19 imprisonment . . . .'") (quoting Cal. Civ. Proc. Code § 340(c)).

20 California Government Code § 945.6 provides that a plaintiff must bring a civil action against a local public entity *under the Government Claims Act* within six months after

21 written rejection of his administrative claim for damages, or, if the public entity does not provide written notice of the rejection, within two years of the accrual of the cause of

22 action. Cal. Gov't Code § 945.6(a)(2); *see also City of Indus. v. City of Fillmore*, 198 Cal. App. 4th 191, 206 (2011). However, Plaintiff did not plead and prove compliance with

23 the presentation requirement of the Government Claims Act, and as such, it does not appear that he may rely on the two-year period provided under the Act.

24

25 Plaintiff's original Complaint was nearly incoherent; accordingly, it is difficult to determine whether he attempted to assert a false imprisonment claim. However, even assuming that he did, the Police Commission Incident occurred on November 10, 2015.

26 The City Hall Incident occurred on January 15, 2016. Therefore, federal constitutional claims under § 1983 arising from the Police Commission Incident were timely so long as

27 they were filed before November 10, 2017, and constitutional claims arising from the City Hall Incident were timely so long as they were filed by January 15, 2018. However, state

28 law false imprisonment claims arising from those Incidents were subject to a one-year statute of limitation. Accordingly, it appears that Plaintiff's false imprisonment claim

Accordingly, it is recommended that the Court decline to exercise supplemental jurisdiction over Plaintiff's state law Bane Act and false imprisonment claims, and dismiss those claims without prejudice.

## V.

## RECOMMENDATION

For the foregoing reasons, IT IS RECOMMENDED that the District Court issue an Order:  (1) accepting this Report and Recommendation; (2) granting Defendants' Motion for Summary Judgment on Plaintiff's Fourth and First Amendment claims arising from the Police Commission and TRO Incidents; (3) entering judgment in favor of Defendants and dismissing those federal constitutional claims with prejudice; (4) declining to exercise supplemental jurisdiction over Plaintiff's Bane Act and false imprisonment claims; and (5) dismissing those state law claims without prejudice.

DATED:  January 26, 2021

_____
PEDRO V. CASTILLO
UNITED STATES MAGISTRATE JUDGE

---

based on the Police Commission Incident had to be filed by November 10, 2016, and his false imprisonment claim arising from the City Hall Incident had to be filed by January 15, 2017.  Plaintiff filed this action on November 3, 2017, long after both those deadlines expired.  Accordingly, while Plaintiff's federal constitutional claims based on the Police Commission and City Hall Incidents were timely, his false imprisonment claims, to the extent that he attempted to assert them, arguably were not.